*Formatted for Electronic Distribution*                          *Not For Publication*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF VERMONT

| | | |
|---|---|---|
| **In re:** <br><br> **JUDY ANN BELVAL,** <br>               **Debtor.** <br><br><br> **ALBERT BELVAL,** <br>              **Plaintiff,** <br> v. <br> **JUDY ANN BELVAL,** <br>              **Defendant.** | Filed & Entered <br> On Docket <br><br> 02/28/07 | **Chapter 7 Case** <br> **# 05-12056** <br><br><br><br> **Adversary Proceeding** <br> **# 06-1014** |

| | | |
|---|---|---|
| *Appearances:* | Albert Belval <br> Georgia, VT <br> *Plaintiff Pro Se* | Geoffry Walsh, Esq. <br> Vermont Legal Aid <br> Springfield, VT <br> *For the Defendant* |

### MEMORANDUM OF DECISION
### G<small>RANTING</small> J<small>UDGMENT IN</small> F<small>AVOR OF THE</small> P<small>LAINTIFF</small>

      Plaintiff Albert Belval ("Plaintiff" or "Albert") initiated the instant adversary proceeding against his daughter, the Debtor Judy Belval ("Defendant" or "Judy") in February 2006, in order to obtain a determination that Judy could not discharge a $30,000 state court judgment he was granted against Judy because the debt underlying the judgment arose from a "willful and malicious injury" that Judy had perpetrated on him. In holding that Judy had unlawfully converted $30,000 belonging to Albert, the state court was not obliged to, and did not, make any findings concerning Judy's intent – i.e., whether the acts underlying the conversion were "willful and malicious." After considering the pleadings, the state court ruling, and the evidence presented at a trial conducted by this Court on December 5, 2006, this Court finds that the Plaintiff has sustained his burden of proof and has shown that the subject debt arises from conduct by Defendant that constitutes willful and malicious injury under 11 U.S.C. § 523(a)(6).[1] For the reasons set forth below, the Court grants judgment in favor of the Plaintiff and holds that the state court judgment is excepted from the discharge granted to the Defendant.

### JURISDICTION

      The Court has jurisdiction to enter a final order in this adversary proceeding under 28 U.S.C. §§ 157(b)(2)(I) and 1334. It is undisputed that this adversary proceeding is a core proceeding.

---

[1] All statutory citations herein refer to Title 11 United States Code, unless otherwise indicated.

**PROCEDURAL HISTORY**

As indicated above, this bankruptcy court adversary proceeding is not the first courtroom encounter between Albert and Judy.

A.  The State Court Action

In September 2004, Albert filed a complaint in Chittenden County Superior Court against Judy for conversion of $30,000 that had been deposited in a BankNorth account titled as "Albert E. Belval DBA Red Barn Storage." The complaint alleged that, in August 2004, Judy removed $30,000 from that account without Albert's knowledge or consent and that even though he had added Judy's name to the account years ago, he had never authorized her withdrawal of those funds from the account. (Trial Ex. A). In June 2005, after a bench trial, the state court entered judgment in favor of Albert. The findings of fact made by the state court are pertinent to the instant proceeding, and are adopted by this Court:

> Plaintiff Albert Belval conducts a storage business in Georgia, Vermont, and in 1985, he opened a business account with the Howard Bank, now Banknorth, N.A., listed as Albert E. Belval DBA Red Barn Storage. In 1993, he added Judy Belval as an additional access person to the account. The account was then listed as "Albert E. Belval, Judy Belval DBA Red Barn Storage BNVT." Judy's access was never revoked. The father had trust in Judy and added her name as "protection" against legal process following divorce. The account was used for deposits and expense payments from the storage business. Judy never made any deposits or withdrawals, and she was not employed by her father.
>
> On August 25, 2004, Albert deposited $45,088.97 in the account, including a Chittenden Bank Treasurer's check of $45,065.97, the net proceeds from a mortgage he executed to cover business expenses. Judy testified that she heard her father had received an insurance payment from a fire loss. She phoned the bank to learn the balance and discovered the balance from the deposit. On August 30, 2004, she withdrew $30,000 in cash, combined that with $7,687.26 she had saved, and paid off a VSAC education loan of $37,687.26 in full on September 13, 2004.
>
> When checks were dishonored, Albert learned of Judy's actions, and she refused to return the money. He reported the matter to the State's Attorney and police, but he was advised that this was a civil matter. He gave no permission to Judy for her to make the withdrawal. According to Judy, Albert promised to pay off education loans to any of his four children if they obtained a college degree, and she incurred the VSAC expenses prior to graduating from Champlain College in 1995, but Albert denied any promise to Judy, from whom he had been estranged for ten years. Albert vehemently denies any promise to any of his four children for educational payments. He did admit to a promise to cover Judy's son's educational costs, which he extended to all his grandchildren, according to another daughter, Cathy Stech. Among the four children, only Judy completed high school and college.

(Trial Ex. C).

The state court held that, under Vermont law, the bank account "was not an absolute joint account, and Judy had no ownership interest in the funds that she withdrew. Her withdrawal and conveyance of the

2

$30,000 from the joint account was an unlawful conversion from Albert." Id. The court awarded Albert damages in the amount of $30,000 plus costs. Id.

B.    The Adversary Proceeding in Bankruptcy Court; The Summary Judgment Motion

On October 13, 2005, Judy filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code. She listed the $30,000 state court judgment on Schedule F of her bankruptcy filing. See Main Case # 05-12056, doc. #1. The Court entered an Order Discharging the Debtor on February 7, 2006. Four days before the discharge, on February 3, 2006, Albert initiated this adversary proceeding against Judy seeking to except the state court judgment from discharge pursuant to both §§ 523(a)(4) and (6).[2] At the time, Albert was represented by an attorney and Judy was proceeding *pro se*. In May 2006, Albert filed a motion for summary judgment pursuant to § 523(a)(6), arguing that, based on the record in the state court action, the doctrine of collateral estoppel mandated that his judgment against Judy be excepted from discharge under § 523(a)(6) (doc. # 11).

In its September 27, 2006 Memorandum of Decision, this Court held that "[a]lthough the Plaintiff may invoke collateral estoppel, the facts established in the State Court Action are insufficient to support judgment as a matter of law on the requirements of § 523(a)(6)." (doc. # 23). The Court further explained that the state court findings established that the Debtor had deliberately and intentionally converted Albert's funds, and did so wrongfully, but that those findings "did not include a determination of whether the Debtor's wrongful withdrawal of funds from the subject account was intended to cause injury to the Plaintiff, and that is a necessary element of § 523(a)(6)." Id. However, the Court also observed that, in her response to the motion for summary judgment, the Debtor sought to justify her conversion of the funds "by contending that she believed the Plaintiff had agreed to reimburse her college expenses. Although the Court has found that the record before this Court regarding the State Court Action does not support a judgment as a matter of law under § 523(a)(6), the Court does find that the State Court Action decision collaterally estops the Debtor from arguing that she rightfully withdrew the funds that were the subject of the state court litigation." Id.

C.    The Adversary Proceeding Trial

At the December 5, 2006 trial, the Plaintiff appeared *pro se* and the Defendant was represented by counsel. Four witnesses testified: Cathy Stech, one of Albert's daughters; the Plaintiff; the Defendant; and Mary Demag, Albert's ex-sister-in-law.

Cathy Stech testified that one month before Judy withdrew the funds from the account, Judy told Cathy that she was going to take the money out of the account; and that in another conversation, Judy told Cathy that if Albert won the state court action, she would file bankruptcy to avoid having to repay him.

---

[2] Section 523(a)(4) directs that a debtor may not be discharged "for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny." Because the Court holds that the Plaintiff is entitled to relief pursuant to § 523(a)(6), it does not reach the merits of the § 523(a)(4) cause of action.

3

Cathy also stated that Judy said she wanted the money to pay back her VSAC loans, but the fact that she still listed student loans in her bankruptcy petition proved that Judy did not use that money to pay back those loans.

Albert testified about the estrangement between himself and Judy that had spanned twelve years, as a result of his "turning her into SRS."[3] He claimed that Judy told him that he was "dead" and that he "would never see his grandchildren" – a statement that Judy later admitted having made. On cross-examination, Albert explained that he had opened the account at issue circa 1983 or 1984 in just his name. Upon his attorney's advice, at some unspecified later time (apparently during a divorce proceeding), he put Judy's name on the account to prevent his wife from accessing his assets. Albert testified that he had planned to use $10,000 of the $45,000 loan he had received and deposited in August 2004 in the Red Barn Storage account to help his youngest daughter, Kim, purchase a house. Three days after he had deposited the loan check in his account, however, the money was gone. He admitted that he had promised to pay for his grandchildren's education; specifically, that he had told his grandson Chris – Judy's son – that he would pay his student loan.

In her testimony, Judy did not dispute the fact that she had withdrawn the $30,000 from the account. She related that when she was attending Trinity College her father visited her apartment and told her that if she graduated, he would pay her student loans. She asserted that there was no question in her mind that she had "every right" to withdraw the money from the account for the purpose that the account had been established – i.e., to pay for her college expenses. Asked whether she had withdrawn the money in order to injure her father, she responded, "not at all," stating that her intention had been to fulfill the promise he had made to her. She testified that, in 2004, she owed approximately $37,000-$38,000 in student loans. She added the $30,000 to $7,000 she had saved up, and paid off the loan. She filed bankruptcy because she had several debts including car loans, credit cards, lawyer fees, and hospital bills, totaling $140,000.

Judy denied that the conversation Cathy Stech testified to regarding her filing bankruptcy if her father won the state court conversion action had ever taken place. She claimed that a year after she graduated, she and her father stopped communicating.

---

[3] The state court found that, for the ten years prior to the 2004 trial, "there was no communication or relationship existing between Albert and his daughter, Judy. There had been an incident years before where Judith left her children unattended, and the father called SRS, and that because of that incident he had not spoken to Judy or had any contact until her son's graduation . . . in June of 2004, which Albert attended." (Trial Ex. B, p. 7).

4

Mary DeMag testified about a conversation she had had with Judy (her niece) while Judy was in college, sometime before 1995. DeMag asked Judy whether her student loans would be difficult to pay back; Judy responded that her father had promised her that, if she completed college, he would give her the money to pay back her student loans. DeMag stated that she had seen Belval during summer 2004 where he reiterated his promise that he would pay Judy's son's student loans, but walked away when Judy's name was mentioned.

D.   Post Trial Memoranda and Motions

The Court directed the parties to submit post-trial memoranda by December 15, 2006. In his memorandum, counsel for Plaintiff argued that while the state court ruled that Judy had unlawfully converted the funds when she withdrew $30,000 from the bank account, Albert had not met his burden of proving "additional aggravating circumstances" beyond those actions which had to be present before there could be a finding of malice (doc. # 39), quoting In re Luppino, 221 B.R. 693, 700 (Bankr. S.D.N.Y. 1998). Counsel reiterated the position Judy had taken in state court, that "[s]he acted under the belief that her father owed her a debt and that she collected upon that debt in accordance with his long standing promise to her." (doc. # 39 at 2). The fact that the state court did not award punitive damages supported his argument that Judy did not possess the requisite intent to injure which undergirded a finding of maliciousness. Counsel argued that the conversion was instead reckless, where the debtor should have known the act was wrong but was without conscious intent to violate the rights of another, and that this state of mind was not enough to support a finding of malice under § 523(a)(6). Counsel also argued that the Plaintiff had not established that the debt arose from fraud or defalcation while the Debtor was acting in a fiduciary capacity, pursuant to § 523(a)(4).

For his part, Albert filed a motion to extend time to file his post-trial brief (doc. # 40), and a motion to reopen the evidentiary record (doc. # 43), stating that he was seeking documentation from Vermont Student Assistance Corporation to submit to the Court to support his case for willful and malicious injury (apparently to establish that Judy did not use the $30,000 to pay off her student loans). Defendant's counsel consented to the extension of time for filing of a brief, but objected to the reopening of the evidentiary record (docs. ## 41, 42, 48). The Court granted Albert's motion to extend time to file a brief, and denied his motion to reopen (doc. # 49).  Albert did not file a post-trial brief.

E.   Factual Findings

1.   Having had the opportunity to observe the demeanor of the Defendant, the Court finds her testimony incredible. The Court gives no weight to Judy's statements that she believed she had a legitimate right to use the money in the account, based upon both her comportment at trial and this Court's determination on summary judgment that Judy was estopped from asserting at the trial that she rightfully withdrew the funds.

5

2. Having had the opportunity to observe the demeanor of the witness Cathy Stech, the Court gives significant weight to her testimony, particularly with regard to the conversations she reported having had with the Defendant wherein Judy revealed a plan both to take the money and later to insure that she did not have to pay it back by declaring bankruptcy.

3. Having had the opportunity to observe the demeanor of the Plaintiff, the Court finds him generally credible. The Court gives significant weight to his testimony that he and Judy had a longstanding estrangement, and that he never gave her permission to take the money from the account.

## DISCUSSION

Section 523(a)(6) of the Bankruptcy Code provides that:

(a) A discharge under section 727 [and certain other sections of the Code] does not discharge an individual debtor from any debt –
* * *
(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

§ 523(a)(6). The statute is written in the conjunctive; it requires the Plaintiff to show that the acts or conduct of the Debtor were both willful *and* malicious. A creditor seeking to establish nondischargeability under § 523(a) must do so by a preponderance of the evidence. Ball v. A.O. Smith Corp., 451 F.3d 66, 69 (2d Cir. 2006) (citing Grogan v. Garner, 498 U.S. 279, 291 (1991)). The policy concerns underlying this provision balance the position that exceptions to discharge are strictly construed in favor of debtors in order to provide them with a "fresh start," with the position that the Code should not "reward[ ] blameworthy debtors through discharge." Maguire v. Gorruso (In re Gorruso), 2004 WL 169706 at * 5 (Bankr. D.Vt. Jan. 22, 2004).

A. Was the Injury Willful?

The Code does not define the words "willful" or "malicious." A long line of cases have held that conversion, as an intentional tort, is often tantamount to a willful and intentional injury under § 523(a)(6) or its predecessor statutes. As far back as ninety years ago, the Supreme Court in McIntyre v. Kavanaugh, 242 U.S. 138 (1916), affirmed the trial court's holding that the defendants, members of a brokerage firm who sold certain stocks "without notice to or demand upon the plaintiff, and without his authority, knowledge, or consent," id. at 141, and who "appropriated the avails to their own use" id. at 138-39, had "committed willful and malicious injury to the property of the plaintiff." Id. at 140. The McIntyre Court approvingly quoted the trial court which held, "To deprive another of his property forever by deliberately disposing of it without semblance of authority is certainly an injury thereto within common acceptation of the words." Id. at 141. A later Supreme Court case clarified that not every act of conversion would result in a debt not being discharged. In Davis v. Aetna Acceptance Co., 293 U.S. 328 (1934), the Court, citing McIntyre, stated that if a conversion was willful and malicious, it would be an injury to property, but

6

conversions which are "innocent or technical, an unauthorized assumption of dominion without willfulness or malice" were not. Id. at 332. In Kawaauhau v. Geiger, 523 U.S. 57 (1998), the Supreme Court's most recent interpretation of § 523(a)(6) – a case not involving conversion but the dischargeability of a physician-debtor's debts resulting from a medical malpractice judgment – the Court nevertheless reiterated its holdings in McIntyre and Davis that, in terms of the willfulness of the act required under § 523(a)(6), nondischargeability required an intentionally-inflicted injury: recklessness or negligence, as it found in Geiger, would not suffice to establish "willful" conduct. Id. at 63-64. The Court explained that "nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury," id. at 61, likening such an injury to intentional torts that "generally require that the actor intend 'the consequences of an act,' not simply 'the act itself.'" Id. at 61-62 (quoting Restatement (Second) of Torts § 8A, Comment a, p. 15 (1964)(emphasis added)).

The Second Circuit had occasion to interpret § 523(a)(6) in Navistar Financial Corp. v. Stelluti, 94 F.3d 84 (2d Cir. 1996), a case where the debtor-defendant had assisted her husband in diverting sales proceeds from her husband's vehicle business. Those proceeds should have been remitted to the plaintiff finance company that had underwritten the company's purchase of the vehicles. In furtherance of the scheme, the husband had written a $200,000 check to himself from his business account (money that should have gone to the plaintiff), and deposited it in a personal account owned by him and his wife. Mrs. Stelluti then obtained a $200,000 bank check from their personal account payable to her husband, drove with him from New Jersey to Connecticut where she opened a new joint account and deposited that check. She engaged in a number of other transfers of money that rightfully belonged to the plaintiff; as a result of these transfers, the plaintiff never received any of the over $600,000 owed to it by Mr. Stelluti's business. The bankruptcy court held that Mrs. Stelluti had acted "deliberately and intentionally" when she diverted the sales proceeds "from New Jersey to Connecticut." In re Stelluti, 167 B.R. 29, 34 (Bankr. S.D.N.Y. 1994). In affirming the bankruptcy court's holding of nondischargeability, the Second Circuit found Mrs. Stelluti's conduct was deliberate and intentional in that she "took a number of affirmative steps that necessarily produced harm to [the plaintiff] as she transferred the funds from accounts in New Jersey to accounts in Connecticut. Not only did she herself withdraw $200,000 of the proceeds from the Stellutis' personal account in [New Jersey] but she also deposited a total of $480,000 in new bank accounts in [Connecticut]. Accordingly, the bankruptcy court properly found that Ms. Stelluti's actions were willful." 94 F.3d at 88.

With those jurisprudential guideposts in place, the Court examines whether the conversion here was committed willfully. It is clear to the Court that the answer is yes. As the Court earlier held in its memorandum of decision on the summary judgment motion, the state court finding of conversion did not address the defendant's intent, as intent is not an element of a state conversion claim. Thus, Albert had the

7

burden of showing by a preponderance of the evidence that Judy's conduct was willful. He has met his burden of proof.

Judy admitted that her act of withdrawing the funds from the bank was deliberate and intentional: she did not negligently or recklessly withdraw funds from the bank. More importantly, she deliberately and intentionally committed an injury against her father by taking a sizeable amount of money from him, converting his money to her own use, and depriving him of its use. Moreover, the conduct at issue intended to accomplish more than just depriving Albert of the rightful possession and use his funds; Judy also intended to protect herself from having to make restitution. This is supported by Cathy Stech's credible testimony and demonstrated by the fact that Judy filed a chapter 7 bankruptcy case when she lost the state court conversion case, thus making it more complex and more expensive for Albert to pursue his claim for repayment.

Judy did not negligently or recklessly convert the funds. The record indicates that she intended the consequences of her act – i.e., to injure her father by converting the funds and attempting to insure that she would never have to repay them. As a result, Albert remained responsible for repaying the loan that was the source of the funds, even though he did not have the benefit of use of that money. In addition, checks Albert had written against the loan funds bounced, a foreseeable consequence of Judy's unauthorized withdrawal. Like Mrs. Stelluti, Judy "took a number of affirmative steps that necessarily produced harm to [the plaintiff] as she transferred the funds" to her own use, 94 F.3d at 88, and the Court finds that the Plaintiff has shown that the Defendant's conduct was intentional under § 523(a)(6).

B.    Was the Injury Malicious?

The term malicious "means wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will." Stelluti, 94 F.3d at 87 (citing 3 Lawrence P. King et al., Collier on Bankruptcy ¶ 523.16[1] at 523-110 (15th ed. 1996)). "Malice may be constructive or implied. . . . Implied malice may be demonstrated 'by the acts and conduct of the debtor in the context of the surrounding circumstances.'" Id. at 88 (quoting In re Stanley, 66 F.3d 664, 668 (4th Cir. 1995)).

The Court finds Judy's statement, that she took the funds in the belief she had the right to do so, to lack credibility. Although a finding of maliciousness does not require "personal hatred, spite, and ill-will," there is ample evidence of that here. Judy could not mask, during her testimony, that she harbored negative feelings toward her father. Both she and Albert testified to a longstanding gulf in their relationship. It is simply not credible that after a decade of not speaking to each other, she believed that his promise to her (if indeed it was ever made) was still in effect. Nor is it credible that she did not foresee and intend that her conversion of the funds would cause her father harm. Her attempt to cloak her intent to harm with the semblance of legitimacy, i.e., in order to show she had "just cause and excuse" for converting the funds, was not supported by the state court record or the credible testimony offered in this

adversary proceeding. Cathy Stech's testimony, which this Court finds credible, emphasizes the element of malice, as Judy did not mention to her the alleged rationale for taking the funds, but only indicated that she was going to take the money and make sure that her father did not get it back. After careful consideration of the record in this proceeding, the Court finds the Defendant's conduct was intentional and malicious for purposes of § 523(a)(6).

## CONCLUSION

The Court thus finds that the Plaintiff has established, by a preponderance of the evidence, that the Defendant's conduct, which gave rise to a state court determination of unlawful conversion, was willful and malicious. Accordingly, this Court finds that the $30,000 judgment, plus costs of Plaintiff's action, as awarded by the Chittenden Superior Court, arises from a debt incurred with the intent and malice described in § 523(a)(6). Accordingly, the Plaintiff's debt is excepted from the discharge granted to the Defendant in bankruptcy.

February 28, 2007  
Rutland, Vermont

Colleen A. Brown  
United States Bankruptcy Judge

9